Good morning, may it please the court. My name is Peter Goldberger, it's my privilege to represent Dan Castro, who is the appellant here of course and was the defendant below, and I would like to reserve two minutes for rebuttal. Before I discuss the 60-month upward variance sentence, I would like to address the insufficiency of evidence on count three, that's the one count. Yes, I'm wondering what do you get from that, because the biggest time is on count nine, isn't it? Do I have that wrong? Well, we... The maximum sentence? We get, if we prevail, we get the occasion of one of two convictions and a re-sentencing, which arguably could moot the entire rest of the case. I mean, it's... Because of the way the guidelines started. Yes, that's the last footnote in that section of our brief, is that it does make an adjustment in the guidelines by itself. I'm not inviting that disposition necessarily, but it, because I think the judge needs guidance on at least one of the other issues. But of course, before you get to the insufficiency of the evidence, you have to get over the appeal waiver. Yes. So how do you... I mean, why don't you address the appeal waiver first, because that's, the insufficiency of the evidence question is academic if you don't overcome that. And it's a very, very broad way of understanding the issue about what it pertains to. It's very unusual to be in a situation where you have a conviction after trial and then one of these standard plea agreements with an appeal waiver in it. And I don't know that anybody's ever looked at this language before and how it would apply to a conviction after trial. The government has properly identified some language in the agreement that would arguably make it applicable. A careful, lawyerly reading of the agreement would support the government's view on that for those two particular references to the conviction and the prosecution and the count three maximum sentence being referenced in the agreement. But when you get to the... Hold on a second, Mr. Goldberg. When you say a careful, lawyerly reading, it says you're waiving all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution. Yes. It seems to be cast in the broadest language possible. So is it really the case that you'd have to be a scholar, a legal scholar, to understand that this means that whatever has to do with this criminal case, at any stage of this criminal case, you're giving up your rights to appeal with respect to that? What I meant was that if the waiver... The waiver has to be knowing and intelligent in the defendant's mind, and that what the defendant understands the agreement to mean is largely controlled by what the judge tells him at the Rule 11 colloquy and not just what the words in this 15-page document are. But you agree with the colloquy. The defendant even took a break, consulted with counsel, then came back at some point during the colloquy. I think Mr. Katcher had a question, spoke with the attorney, came back, and the colloquy continued. I don't think there's any suggestion that it was on this subject. Well, not on this subject, no. I'm saying he hadn't... Yes. He had full access to his lawyer, for sure. He had a chance to clear up any questions. That's right. I mean, he's a man with two graduate degrees, and a person with a long and deep history in law enforcement and criminal prosecutions, right? Well, on the state side where they don't have waivers like this, but, you know. I mean, he's no ignorant fellow who just fell off the turnip trip. He's a very experienced, educated fellow, and with, indeed, specific experience in justice administration. That is true. Okay. So, was there anything in what the judge... I think everything the judge said indicated that count three wasn't in the mix of the waiver. The waiver tells the defendant, and we've laid this out in detail in the reply brief, tells the defendant that he is waiving all sorts, the right to appeal, all sorts of rights that come up pre-trial, and it says nothing about trial. It tells the defendant that it's a waiver of the right to appeal his sentence, contrary to the language of the written agreement. All the oral references are to the appeal of the sentence. All the examples and instances that are given are about the sentence. So, your position is, and I guess this would be unprecedented, wouldn't it, that if the judge doesn't specifically mention something that is specifically mentioned in the plea agreement? I think every case, you'd have to look at the totality, but I think, potentially, yes, that would be true. You have to look at it from the point of view of the defendant and how it is explained. Or is it just that this case is so unique that you have a guilty plea after a trial where on one count you have a conviction? Right. And you would think that in the unique circumstances of this case, this particular question would be expressly addressed orally by the judge, and more clearly addressed in the written agreement. The language that we both highlighted in our briefs, and Judge Jordan quoted, is standard language. This is nothing that's unusual to the unique circumstances of this case, even in the written agreement, much less was it ever highlighted or made clear to the defendant in the oral. If we didn't agree with you that the way the judge handled the colloquy overrode the waiver, can you still succeed on your miscarriage of justice argument? What's the best line of attack there? Right. Is that a conviction for a felony, which is directly contrary to the evidence, it's based on a misunderstanding of what the words of the statute mean and encompass. Not even, well, just a flat illegality insufficiency argument is a miscarriage of justice. It results in the defendant being convicted of something he is accused of, but which is not a crime. Okay. And how do you respond to, I know this is in your reply brief, but I want to draw you out on it a little bit more. You know, the government's response to that in effect is, one of them is, it can't be a miscarriage of justice for somebody who was in his own mind actually trying to commit this crime. He was working his utmost to commit this specific crime. It just turned out that he was wrong about underlying facts. So it really can't be unjust for him to go to jail for the crime, which he was certain he was actually committing. And the answer to that is? The answer to that, my answer to that is what we said in the reply brief, is that this distinction that the government tries to draw between justice and law is shocking. There is no justice without law. They're saying it is not unjust to be convicted of- I'm not supposed to make that statement. Well, certainly to say that he can be convicted because he had a bad intent- It's not moral culpability. When he did not, right, on a purely bad moral culpability intent basis to do a thing which is not against this statute. That cannot, that is neither law nor justice. We have no justice without legality. Well, wouldn't- It's a mystery to justice. Yeah, ordinary, you know, if you went out and you asked somebody out there wandering out on the streets, is it fair or not fair for somebody who's really attempting to commit a crime to be set free because the government asked the wrong question during the Sting operation? Well, what's not fair is they don't record the interview. So that's to start with. They could record the interview and then we wouldn't have any question. What question was asked and what answer was given. But putting that aside- But if they were making stuff up, they'd have made up a better question, right? They were, they had bad legal advice about what violated the statute. They were trying to get him to commit this crime. I mean, that's what they go- Mr. Castro must have had- Let's not give one dollar and one line to the FBI agent. You understand. Yes, Judge, sorry. Oh, go ahead. I'm sorry. And we don't just ask the man on the street what's fair. I mean, an awful lot of this court's case is finding a miscarriage of justice, things that would pass the court into disrepute, the fourth stage of- That's the point, right? Of plain error. It is a question about how it is perceived.  That's the whole notion of disrepute, et cetera. Would it be distressing in a miscarriage of people's sense of what's fair and right and just to send this man to prison for a crime for which he was convicted by a jury, which he was actually trying to commit, even though, and I realize this is a big even though, there's a pretty darn good argument that he didn't commit the crime. I would hope that the public would think, and I think the presumption in this view is of a well-informed believer in our system of law would think it was wrong to convict someone regardless of his subjective intent of doing something which is not a crime. He thinks that possession of this drug is a crime, but the DEA never scheduled it. Or the example I gave in my reply brief, someone claims to be a United States citizen, thinks that his claim is false unbeknownst to him because he was only a baby at the time. He was born in this country and his parents never told him that. You could give lots of examples where people could be wrong about the thing that they think they know, and where the thing that they know is not true, and the thing that is true just is not against the law. That is a miscarriage of justice, to be convicted of something which is not against the law. So why wasn't this argument pressed in the district court? The lawyer didn't think of it. I think the distinction between, you know, he was a political science major, I was a philosophy major. This is an epistemology question. What do we mean by knowledge? Okay. I can't answer that question. The answer to that question is not on the record. Is that the official answer to that question? Well, if you're a philosophy major, you should be able to answer the question. Yeah. I guess I ask it because it sort of goes to the question of miscarriage of justice. If this is something that didn't even occur, a thoughtful defense lawyer throwing himself at this with all his might and mine and then the bigger, can it really be said to be so that justice has gone off the rails? Yes. We have a lot of plain error of that kind that we identify and allow for and reverse on account of. And we could have this same discussion, perhaps should for a moment, about the acceptance responsibility argument on the sentencing, the third level, where that also, if it is an ordinary guidelines issue, would be encompassed by the waiver. But because it involves two things, we can reach it notwithstanding the waiver. One is that it involves a separation of powers question. That is, to which branch of government has Congress assigned this power when in the 2003 Act it directly amended the 3E1.1 adjustment for the third level? And second, does it come within an arguable understanding of the constitutional exception in the plea agreement waiver, a language which this Court has previously identified as ambiguous if not unintelligible, has since been removed by the government from the standard waiver and which was never explained or even mentioned in the oral colloquy. So for those reasons and one additional important reason, we say that you can reach and ought to reach the question of whether the judge had any discretion to refuse the government's motion. The other is that you can't have the really intelligent analysis of the reasonableness of the substantive reasonableness of the sentence, which is outside the waiver, without resolving the difficult question of the starting point. Reasonableness is measured in relation to the guidelines calculation. So where you have a purely legal, serious, arguably constitutional problem about the ruling on a guidelines issue and which in self... But it would be if we agree with you on the count three, we'd be out there with dicta, right? Because as a... No. I wouldn't call that dicta. Well, we're sending it back on count three and it's up to the judge to decide what he wants to do. The formal resolution of our decision wouldn't bear on the error that you allege occurred at sentencing, right? I can't agree that it's dicta to resolve a question that is properly presented which will arise again, necessarily arise again on remand. It's in the court's discretion whether to reach that second issue, but it would be a good use of the court's discretion and it's not dictum. It is a question presented in the case and which will arise on resentencing if there is a remand for resentencing. I would be happy to address the substantive reasonableness arguments that were made. Let's just take a few minutes and discuss it. We have these cases out there and you pick them up in your brief that talk about, and it cites the Supreme Court language that says that you've got to impose the sentence which is no greater than the maximum sufficient to establish the legitimate focus of the court's sentencing. It seems like no one does that and it's strange to me that sentences pop up in these nice little mathematic blocks of five. So it's 60 or it's 72, but why not 42 and a half? Why not 38 and three quarters? It might seem like kind of a facetious argument, but when you're sitting in prison and the difference is 60 months versus 38 months, that is a very substantial difference and yet courts just don't do it. I don't know what more we can say to get district courts to do it. There's never going to be a mathematical answer, but I do think that it's right to say and I wish the court would say that what we mean by reasonable is, is it reasonable to believe that this sentence on all the facts and circumstances of the case is the sentence which is sufficient but not greater than necessary to achieve those purposes. Not just is this sentence reasonable in some more abstract sense. The issue is why. And as we said in Negroni. And then to explain why. Yeah. Well, that's exactly where I intended to end up. And which is to say that you could focus just on the articulation of reasons and say that the sentence in relation to the articulation of reasons is not reasonable. And that was how Negroni was resolved. And here I am with my friend, Mr. Lappin, and we were on the opposite sides of this argument in Negroni in front of Judge Shorten. So we've all been there before. We could say that the sentence for very much the same reasons is substantively unreasonable just because of the weighing of this very substantial mitigation, community service accomplishments against really a strained claim for aggravating circumstances that aren't accounted for in the guidelines. Strained claim? Yes. Okay. The judge went through carefully and I don't think there's any fair way to say he didn't pay attention to the mitigating circumstances. He commented on it specifically. Right? And then he turned to talking about, look, this involves lying to the FBI, conspiracy to aid. Those are the crimes of conviction. I mean, he runs through the specifics of the crime. He focuses down on the possibility that if this had been real and not a sting, that there would have been real injury, perhaps even death. All of that is what sets the guideline level. None of that is a circumstance that gets you above the guidelines. You can say the guidelines are so elaborate, you can posit that everything is taken into account in some form or fashion by the guidelines. It's the very fact that there are extreme cases of even that which is contemplated by the guidelines that prompts the guidelines themselves to recognize departures and prompts the courts to recognize that you can vary. So I don't think you get a lot of traction there. I mean, this judge is going through and talking about this high-ranking police officer engaged in corruption of the grossest sort and feels that it brings serious problems beyond this individual case because of how it tarnishes law enforcement in the city of Philadelphia. So why is it substantively unreasonable, unreasonable for him to say, you know what, under those conditions we're good enough for you. You need a bigger hit than that. Because it was all about the fact that Mr. Castro was a high-ranking police officer. But he did not misuse his office. There was no corruption. This is not a corruption case. This was an ordinary case of the kind for which he was convicted, committed by a person who, according to the jury, who was at that time a high-ranking police officer. But he did not misuse his badge. He did not act corruptly in office. That's where the aggravating circumstances that were discussed in Osborne contrast with the, if anything, the mitigation as the Supreme Court described it in Coon of being a police officer convicted of a crime. Is it wrong for the district judge to reflect upon Mr. Castro having been reprimanded and removed from his command in 1999 for malfeasance? Was that an inappropriate thing to take into account at the sentencing phase? No. It was something that happened well over 10 years ago that he could take into account. This is what I mean by strain. To find a negative. He had two negatives that he mentioned. That was one. It was a bad, it was absolutely bad, but it wasn't in the commission of this offense. It was, and you have to balance it against all the good things, which he recognized, but then never said, well, it would be this, but I'm going lower because of those things. And the only other negative thing he said was, you don't have letters from your adult children, suggesting that the judge was going to give more weight to the opinion of the defendant's son, who was recently released from prison after committing a crime, than to every other good thing that he'd done. I mean, that's what I mean by straining. To find a negative. Are we, are you inviting us to do our own weighing and derogation of what the district court did? No. Because the argument sounds like, Mr. Goldberger, that he just weighed it so badly, but it looked like he was trying to weigh it and acknowledging, this is a man who did really good things, and I'm impressed with how many people he touched in a positive way, and I've heard all those people, but I've got this other stuff I have to deal with on the negative side. Isn't that what district court judges have to do all the time when they're faced with a difficult sentencing decision? Yes, it is. And to some extent, you don't do the weighing yourself, but you do, you're put in the position by this system of asking whether the way it was weighed, and the reasons that were articulated to explain the outcome, make the weighing process, take the weighing process outside the range of the reasonable. And here, to go from either 37 or 41 months, depending on where you start, depending on the guideline ruling, to 60 months, more than a 50% increase, 60 some percent increase, doesn't explain how all that good got weighed into the process, and I'm suggesting that a reasonable judge would have given it, necessarily given it substantially more weight. Yeah, but you have to say that no reasonable judge would have given the same sentence, right? That's what the formula says, and yet there are reversals, and it always sounds personal, but it isn't personal. Yeah, the reversal is in the other direction, which is the Nagourney problem. Right. Thank you. May it please the court, Lou Lappin for the government. I'd like to move a little bit away from epistemology and philosophy and get right into reality. Were you a political science major? I was not. Oh, good. I was not. Okay. An English major. Okay. That's reality. There you go. That's real, but we're going to be real today, and what we really need to be real about is this appellate waiver, because this appellate waiver is clear, it is unambiguous, and it is almost remarkable that we're standing here today talking about whether this appellate waiver applies to the two claims that the defendant has raised outside of the substantive unreasonableness of the sentence. Do you think it's remarkable to be talking about sending somebody to prison for a crime that they did not, as a matter of law, commit if we accept the defendant's argument? Well, I don't. I have an argument, a strong argument why the defendant is absolutely wrong about that, but let's start, if I may, where we started earlier with the appellate waiver. We'll make sure you get time to show that, Mr. Lappin. We'd like to hear it. Why don't you actually start with that? What is your argument? I mean, we've seen your briefing, but how can it be the case that it is false to say I didn't get money from Encarnacion when he didn't get money from Encarnacion? Because, number one, I want to start with the standard, and the standard of review on a sufficiency claim is interpreting the facts in a light most favorable to the government, number one, and number two, we are in miscarriage of justice land. Okay. Well, let's start with number one. Do you have any facts that show that Encarnacion gave a penny of that money to the FBI to turn over to Mr. Castro? All the facts in the case support this view, interpreting what happened in a light most favorable to the government. Is this your agency argument? Excuse me? Is this your agency argument? Yes. That the defendant specifically says, I am not arguing, and he says it in a footnote, I am not arguing here that the distinction is between a direct and an indirect payment, and the jury was entitled to see the facts of this case as the FBI stepped in. Yes, it was a Singh operation, but they stepped in and they made payments on Encarnacion's behalf. Now, that's – you talk about remarkable. That's what I think is remarkable. There's no evidence in this record that anybody ever went to Mr. Encarnacion and said, how about we pay money for you? And he said, yeah, please do, and they went out and did it. This was a Singh operation, Encarnacion had no idea what was going on. It was the FBI acting unilaterally. How do you gin up out of that an agency? In fact, if you can, Mr. Lapin, you should have been a philosophy major. Well – How do you get that? Well, because this is not a question of formal agency. This is a question of how one interprets these – Well, it's a question of fact, right? And there's no fact to support what you're saying. Well, no, there is a fact to support what I'm saying because there is no requirement that if somebody wants to pay somebody else's debt, they have to reach an agreement with that person. Well, they don't call that agency, though. They seized the money, and this is in the reply brief. They seized the money when they did the search, and they never gave the money back to Mr. Castro, did they? No, they didn't. No. That's correct. How did they pay it on behalf of Encarnacion? His debt still remained the same, right? Because in the course of the sting, that's exactly what was happening, and that's what everybody in the courtroom understood to be happening when this case was being tried. That's how the defendant interpreted it. The government interpreted it. Everybody interpreted it that way. And at this point, this court, to reverse this, has to find – No, that was true. I mean, it wasn't true that they were paying it on behalf of Encarnacion. It was true in the – absolutely was true in the case in the course of the sting, that they were paying that debt on behalf of Encarnacion. Encarnacion owed that money. It was a legitimate debt. It was a legitimate payment. It was real money, and it was delivered to the defendant in the course of the sting on behalf of Encarnacion. On behalf of – And that was a way for the jury to read it. How can you jump over – how do you turn that in behalf of language into something that's in the record? Because there isn't anything, is there, Mr. Rabin? This is a construct that the government is creating in order to say that, yeah, the money never came from Encarnacion, but you should believe that it would have come from Encarnacion if only he had known we were doing it. It is in the record. Where? When the defendant, for example, testifies. Now we know it's a government sting. It's over. And the defendant is testifying in court, and he's asked questions about this money. And he says the first payment that he received was $4,500 of my $90,000 that Encarnacion owed him. He agreed that the $14,500 he received was from Wilson. He admitted he lied to the FBI and used that to his advantage throughout the trial. He got up on the stand. He cried. He said he was sorry, and he said, I lied to the FBI. And that was a strategic choice that counsel made, as you asked earlier. But the statute criminalizes not making a lie, making a false statement. And he didn't say anything false. He may have been mistaken, but that doesn't make it false. Yeah, he didn't lie to the FBI. I mean, he said that on the stand for obvious reasons. Well, he wanted to lie. He just was such a bad liar he ended up telling the truth. He only, he, counsel is only right, and your point is right, if you take the most narrow interpretation of what happened here. But we're looking at the facts at this stage in a light most favorable to the government, and it's a very reasonable, and I beg your indulgence here, because I know at this point you disagree with me, but it's a very reasonable interpretation of these facts in the ordinary parlance, just as everyone understood them in court, to mean that what the FBI was doing was making this payment from Encarnacion. You're making a legal argument, right? Isn't this a legal argument, not a factual argument? You're asking, you're not, the dispute here isn't about the facts. The dispute here is about what constitutes a false statement. I'm struggling to find where there's a factual dispute in this record. Even when the agent testified about what happened, he was asked, did you ask the defendant whether he had ever collected any money from Mr. Encarnacion since he originally gave him the $90,000? And the defendant, and the answer was we did ask him, and he said he had not collected any money. There was a meeting of the minds here. If there was any ambiguity in the question, as the defendant argues, there was a meeting of the minds. Everybody here understood exactly what this question was about and what the answer was. That's part of the thing that troubles me. If you look at Bronson, the court basically said that the way to correct a situation like this is not with perjury, not with a perjury statute, but with a question. The agent knew exactly what he had. The agent knew exactly what he had to get Mr. Castro to say. When the agent heard Castro say no, the agent knew factually, well, that's right, I better rephrase my question and come at this a different way. He could have easily, very easily, taken all about 30 seconds, asked another question. Did you ever have an interaction where you thought that maybe you were getting money from Mr. Encarnacion? Well, he asked those questions too, and those were the other counts in the indictment. He asked other questions. The context of all the questioning was very clear to Castro. And this answer, when he answers, there was no ambiguity. The answer is he had not collected, or Castro's answering, I had not collected any money. There is no follow-up question that's necessary. The question is did you get money from Encarnacion, right? And his answer is I had not collected any money. That was the testimony. In response to the question, did you get money from Encarnacion, look, I am not suggesting for a second that in the heat of a sting operation when an officer is doing something where, you know, Monday morning quarterbacking months or years later, it's easy to look back and say, should have done it this way or that way, that it's easy to do the job that the agents are doing. And I'm sure these were highly competent, very good agents. So I wouldn't want anything that's being said to denigrate their work. But what Chief Judge McKee is asking, I'm asking too, doesn't the Supreme Court's precedent in Braunston tell us that when we run into a problem like this, the answer is not to make the law fit the odd fact, it's to tell the FBI and other investigative agencies, you've got to ask the right question. If they'd said, did you receive money from anyone that was represented to be from Encarnacion? Did you ever get money from anybody in connection with this? We wouldn't be having this conversation. But they asked the question the way they asked it, and they got the answer they got. And it's not literally false, is it? The Braunston cases, as we argued in our brief, are all distinguishable. I'll take that as a no. I mean, it's not literally false, is it? Respectfully, Your Honors, I disagree. Under the facts here, our position is, and I believe that that statement was literally false. Under a more narrow reading, and I respect that that is your position now, but I do not in any way, shape, or form concede. This defendant's statement was literally false under all the facts. And then if we move to miscarriage of justice, okay, now what the standard is under Wright-Barker is that the district court judge and the prosecutor were derelict in their duty in even allowing this issue to go to the jury. After the defendant and everyone agreed that what he had said was a lie and that he used that as his strategy and chose not to present that, present the argument that Your Honors are addressing today and that defense counsel, appellate counsel has raised. He chose not to pursue that, not because he's an inexperienced lawyer who didn't know what he was doing. He's an outstanding lawyer, Mr. McMonigle. And Mr. McMonigle chose a very different path that would have been entirely, entirely inconsistent with also putting the defendant on the stand and having the defendant say, well, I'm really not lying. He said, I lied, I'm sorry, that was wrong, and I should be forgiven because I was just pushed into all this by the government. So it can't be that after all that is presented to the then Chief Judge Bartle, he's supposed to, we can say that he's derelict in his duty by not taking that away from the defense and saying, no, no, no, this is, that's not the issue, this is, the evidence is insufficient and I'm on my own granting a judgment of acquittal. What do we do with the Jones case? Jones says that affirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt affects substantial rights and seriously impugns the fairness and integrity and public reputation of the judicial proceedings. What are we to do with that precedent? Assuming we got past, you know, you keep saying your position, your position. At this stage of the game, we're pressing you, we're asking questions. We're not taking positions, we're asking questions. But assuming we got past the is it literally false or not and thought it was literally false and therefore there was a failure of proof. Literally true. Right. Okay. Excuse me. That it was a literally true statement, not false. And we got to the miscarriage of justice point. How do we steer around language like that in Jones? Because I think then we look at the whole circumstances of the trial, the strategy that the defense employed. I think we can also consider the appellate waiver that this case was over. The defendant was convicted on one count. The jury acquitted on one count. The jury hung on the others. The defendant through able counsel decided, listen, this is how this should get resolved. And the defendant received substantial benefits. All the other counts in the indictment were dropped. He pleaded guilty to one count. The judge sentenced him to 60 months on the extortion, a concurrent term of 18 months on the false statement. And when you look overall at the entire course of events here, this case was effectively over unless you were to decide that the sentence is Help me with this. In looking at the purposes of this sentence, as I looked at all the judge said, and he was very careful, I think, commendably so, to put onto the balance what Castro had done on the positive side as well as on the negative side. And I look at the sentence and I try to figure out, well, is he imposing the sentence primarily for deterrence or for punishment? It seems to me everything else is off the table. There's not a need to rehabilitate here. Unless you disagree with me, it seems like this sentence is not aimed at rehabilitation. It's got to be either deterrence or punishment. If it's either or both of those things, why wouldn't a sentence of four years or three years or 37 months be sufficient on this record to satisfy those sentencing objectives? I'm not saying that it wouldn't, or that other judges might think that 37 months are appropriate. Some judges might think 48 months. Some judges might think 72 months. But I think, as Judge Jordan pointed out, the standard is whether no reasonable sentence in court could have imposed this sentence under these facts. And this judgment- Well, that's under the reasonableness. But also we have the Ahlersky and the persimmony duty that the Supreme Court has talked about that gets, as I said, Mr. Goldberg, what's in our opinion, is I get the feeling sometimes it's there only to make the margins come out nicely because no one pays any attention to it. But wouldn't it be better, and not only would it be better, but doesn't it only require it? Because it should work both ways. It should only work when the court is ratcheting down and we say, look, you've got to tell us why you departed. But it should also work, unless I'm missing something, when the court ratchets it up. And why wouldn't a sentence of four years or three years or somewhere in that 30 to 70 months or maybe less, or maybe 55 months, why wouldn't that be sufficient to both deter and punish? And if we can't tell on the record what the court had in his mind to satisfy the requirements of negligee, why wouldn't we send it back? Well, that's the right question, Your Honor. What can we tell from the record? And what we can tell from the record is that the court very, very carefully considered the sentencing factors, including the ones that you highlighted, deterrence, punishment, promoting respect for the law, and the seriousness of the offense, and also considered all of the positive factors for the defendant and carefully weighed them. This was an egregious case. This was a case in which one of the highest-ranking Philadelphia police officers participated in what he thought was a very serious extortion scheme, and the evidence was that he was participating in three of them. And he had said in the course of this scheme that he was willing for these collectors to go as far as they needed to go, beating somebody up so long as somebody didn't die. That was his only limitation, knowing full well that there was a risk that somebody could die. The judge heard all that. He was in a unique position as the district court judge, hearing all the evidence in the case, to evaluate that and evaluate these sentencing factors. And he spoke eloquently on how this defendant disregarded his oath and responsibility as a high-ranking police officer, that the damage to the rule of law and to the democratic fabric way of life is severe. He said the crimes diminished the stature of the Philadelphia Police Department and tarnished all who wear the uniform. Can you hold on a second there? Because I'd like you to respond to Mr. Goldberger's assertion that this was not about corruption. So it really was not. I mean, the implication was it wasn't fair to kind of pull that in and make it sound like this was hitting the whole department. What's the government's comeback on that? It absolutely hits the whole department. This is a major stain on the Philadelphia Police Department. I mean, you're talking about a police officer committing one of the lowest-level serious violent crimes imaginable. And there was an element of corruption, quite frankly, in the whole history leading up to this. They weren't on the counts of conviction, but the judge heard how this defendant was willing to provide favors to the cooperating witness. He was going to get them a television in exchange for running a license tag that could have resulted in somebody also getting beaten up and threatened for money. I mean, this is something the Philadelphia Police Department, this is a nightmare for them when they have to deal with police officers who commit serious crimes. And there is no greater stain on the police department and nothing that more seriously threatens the integrity of the department and the citizens' faith in the department. And he recognized that, and he imposed an eminently reasonable sentence. And I understand, Chief Judge McKee, that there are other sentences that other judges could have imposed. Yeah, but that's not the issue. I understand you're going to get that kind of disparity from Judge A to Judge B to Judge C, and this is no way to take that out of the equation unless we use the Excel spreadsheets that I think the Sentencing Commission will one day formalize and advocate. But what I'm talking about is just for the judge that is imposing the sentence. The sentencing judge put on the record to let us know, and perhaps let the public know, that the judge took all that into account, figured out what he had or what she had to do with the sentence, what the end objectives were, and then explained, as we say to Negroni, why that sentence is the least severe sentence that would meet those objectives. And I've heard everything you've said, and you, as always, are incredibly eloquent and very, very forceful and very persuasive. But I still can't find anything on this record that would explain to me why in this judge's mind, not another judge, in this judge's mind, a sentence of four years or four and a half years or three years or three and a half years wouldn't have taken all that into account. It clearly still would have punished. To whatever extent there is, assuming you believe the concept of general recharge, in these kinds of cases, it probably works. I'm not sure it does, but let's assume it does. So let's assume there's a general deterrent component and a punishment component. It seems to me four years or four and a half years may get you there, too. Maybe it wouldn't. But if the sentencing judge thinks it wouldn't, how does he know why? But I would ask the question, how would that really go? Like, what would he say? He said all that I said he said. He said the guideline range was too lenient under all these facts and circumstances. He said one of my most serious considerations was all the great things that I heard about the defendant. He says he's taken that into account, which has worked in the defendant's favor in him arriving at his sentence. Now, what it seems like you're asking is what's implicit in what he is saying. He's saying this is what I think is the appropriate sentence under all these facts and circumstances. Now, there's a 19-month increase from the high end of the guideline range to the sentence that he imposed. So he could say, all right, now, if I increased one month, that wouldn't be sufficient because that's two months, five months, ten months. My point is, Frank, you're asking a very good question that I've asked myself every time one of these cases comes up. And so I don't want to get a short shrift to your question of me because it's a very, very fair question. And I frequently ask myself, and it's not just the Supreme Court. It's in 3553A where they talk about the least serious sentence consistent with the objectives. And I frequently ask myself, well, what does that look like? And how do you explain why you feel in your own gut, in your own cerebellum, that 60 months gets you where you need to be and 55 months doesn't? But it would be helpful to see some kind of engagement on the record with that thought process because it may well be that the court would come back and say, well, now that I've thought more seriously about it, I guess four years would meet the objectives that I want to meet. Maybe it wouldn't. Maybe if they had thought more seriously about it, I'd give them the statutory maximum. Judge Bartle, Chief Judge Bartle at the time, was very careful. Of course he was careful, and he certainly considered what the other options were in imposing sentence. There is no mathematical precision to any of this. I would argue this is an outstanding record. Isn't that exactly the problem? There is no mathematical precision. So we need to know, according to 3553A in the Supreme Court, that whatever sentence is derived at is done in a manner that doesn't unduly punish the defendant. It doesn't punish him beyond that which is necessary to satisfy the 3553A objectives. You can make a very strong argument given the egregious nature of the conduct that anything less of that would have diminished the serious nature of the offense. I don't see that on the record. That would have not served the purpose of general deterrence. I don't see that. And I don't think it's just a calisthenic. It's a way of getting a sentencing judge to focus seriously on the fact I'm taking someone's liberty away. I want to make darn sure that however much liberty I take away is justified by the individual characteristics of the defendant, the circumstances of the crimes of conviction, and all that comes together in a way that I can feel good within my own legal jurisprudence and my own heart that I didn't put this guy behind bars for one day, which is not realistic, speaking hypothetically, for one day longer than is necessary under the sentencing statute. The question you've asked is an extraordinarily good one. I can't tell you more precisely how it should be done, but it should be on the record. I'm going to try to answer it, okay? Because this judge did consider all the factors, and he articulates them. And the only thing that isn't present is what I would consider, under the facts of the case and given the record that is there, what would really be an artificial exercise. And I think that it would be presumptuous for a court of appeals to step into the shoes of Judge Bartle and suggest that he didn't consider alternative sentences. I mean, the opposite seems clear to me that he did. I'm not saying he didn't consider alternative sentences. I'm saying he didn't explain why those alternative sentences that I'm sure he did consider wouldn't have addressed the sentencing objectives that he was trying to satisfy in opposing the sentence. And the answer is, by identifying and articulating how serious a crime this was and how it affected the citizens and the police department, how the defendant deserved to be punished severely, and by saying that the guideline range is too lenient. Implicit in all of that is that he considered what alternative sentences there were that he could impose, and he imposed what he thought was a fair sentence. Assuming the guideline range is too lenient, that gets me to read a sentence of four years. I understand the difficulty of what I'm suggesting should have been done. I understand the difficulty of your response to me, which is a very, very good one. And if I may say something about Negroni, because that's a different case. The court decided that that was procedurally unreasonable. It was a 70- to 87-month guideline range in a very serious fraud case, and the judge went all the way down to probation, and there weren't any outstanding reasons that anybody could point to. It was a garden variety... Yeah, but if we look at... Case, this is not garden variety. But if we look at Negroni, and quote, and when I use mitigating, as Mr. Goldberger suggests, substitute aggravating for mitigating. What we said there is it is not enough to recognize mitigating factors. Rather, the chain of reasoning must be complete explaining how mitigating factors warrant the sentence imposed. If you take out mitigating and put in aggravating, that's my concern there. And I agree, right? And I think, obviously, this court has to follow Negroni, and that's what happened. Negroni doesn't say, and in making that consideration, the court has to delineate each and every different alternative sentence and why that was not enough, or why it was too much. I mean that in very clear words. I'm not suggesting that. What I'm suggesting is 3553A, and the Supreme Court requires that we do more than just ritualistically mumble the rule of parsimony, that we seriously consider and require courts to explain why a less severe sentence will not satisfy all of the objectives that the court is trying to satisfy. We may just be at an impasse, because you've made a good point that I don't have a response to, really. But I'm just trying to share with you, I guess, my frustration that we have this requirement out there. It's in the sentencing statute of 3553A. The Supreme Court has picked up on it. How we implement that is very difficult. But in a case like this, it really seems to come alive, because this is clearly a guy who screwed up big time in a way that could have gotten not just one, but a couple of people seriously killed. On the other hand, apparently it was a real force within his community, within his family. I understand the issue about his son and daughter not having letter sent in. I don't know what the dynamics of that are. Well, there was some evidence in the record from the daughter that the defendant had stolen money from her. So, I mean, the judge heard this case. He knew what this defendant was about. He understood the seriousness of the offense and he imposed an appropriate sentence. Well, it's not an easy case, because usually, when you have cases where people in this life, where you're one step away from being police commissioner, especially in Philly, you develop chips that you can call in at times like this. But this is not this kind of a case. This is not somebody who's just relying upon some city council folks coming in to testify him who might have felt that, I'm not denigrating or casting aspersions on their motivation, but they come in and they're clearly putting themselves in a light where they're going to be more favorably seen by members of the electorate, so maybe you can write off the motivation. Judge Bartlett even said that he'd not seen a case where he had this kind of community support with maybe one or two exceptions, which says to me that this was a guy who was doing a lot of very positive stuff. And it may be the positive stuff rather than where the judge would have gone anyhow. It may be that the judge only focused in on those two things that Mr. Goldberger pointed out and that drove the sentence. But again, if that's the case, then I'd like to see why those two sentencing objectives couldn't have been met in a more parsimonious way. I'm not sure we're getting anywhere here. Anything else you wanted to say? I think if Your Honor reversed every case where the judge could have said more and could have been clearer, we would have new sentencing hearings in almost every case. No, you're right about that. You're right about that. So I would ask that the conviction and sentence be affirmed. I would ask that Your Honor enforce the appellate waiver that the parties and the defendant in particular knowingly entered into. I didn't get a chance to address that as much we jumped into sufficiency. And I'd like to highlight that the colloquy on that was very clear and that the specific language of the plea agreement was, and the waiver was that it applied to the entire prosecution. There is no... That's in the plea agreement. That wasn't in the colloquy. That was in the plea agreement. The written plea agreement is crystal clear in that regard. Correct. And as part of the colloquy, the prosecutor was asked to read the... summarize the terms of the plea agreement. And in doing so, he read that into the record. And so it's in the record that this applies to the entire prosecution. It would be absurd to read this contract in any other way. This was the finality that was to be brought to this case in a deal that substantially benefited the defendant. He faced a much lower guideline range than he could have faced if he went to trial on other counts. It was a deal that the system encourages. We encourage the finality that is brought to bear by plea agreements and appellate waivers. And he got the benefit of that. The government abided by its terms of the plea agreement. And that should be enforced on those explicit terms of the plea agreement. The defendant said he understood that the court reviewed with him, that the prosecutor reviewed with him, and that his counsel, when he took a break, as Your Honor noted, during the proceedings, reviewed with him. And there was no ambiguity other than the ambiguity that counsel creates by saying the entire prosecution doesn't mean the entire prosecution. That's what it says. Thank you. Thank you very much. Mr. Lappin, it's still not too late to get a degree in philosophy. They have all these online courses now. You can do it at night in your spare time. We assert in our reply brief that there was no such reference in the colloquy. And I don't have time to go back and read those five pages again and see if I made a mistake. If I do, I will withdraw it. But I think it's Mr. Lappin who was making a mistake there about the colloquy. To whether it was read into the record. I mean, that language is in the plea agreement. He's a well-educated man, deeply experienced in the administration of justice. He said he had read and understood the plea agreement. So it's fairly reflected in the record, is it not, that he read this and knew what it said? Read it, yes. Knew and understood what it said. I'm not agreeing with that. Well, you can't agree with that, because the game's over if you read it. All right. And I don't even want to take my whole two minutes, but I do want to say about the facts of this case and the severe offense references that are made, the jury did not agree with the government's view of the evidence that we hear repeated again. The government recites allegations that were made by the informant that the jury did not believe. And the FBI agent admitted on cross at trial. Some, in fact, the foundation of the investigation was false and baseless that he was told by the informant. And had he known that at the time, the agent said he would have gone in a different direction on the investigation. Can I ask you a question? Not, well. 3E1.1. Sure. Maybe this is standard boilerplate. It certainly looks like it. But in none of the cases where we talk about whether or not that one-point deduction is mandatory or discretionary, upon filing of a motion, is there a language which we have here where in the plea agreement it specifically says that. Yes. What we're agreeing to here is not binding on the court and the final determination is up to the court. The government then files a motion. Why shouldn't we look at that issue over whether or not the one-point is mandatory or discretionary in addition to the two points that he gets as simply being the government not filing a motion necessarily to have the court give him the one point, but simply saying that the guidelines would say that you get one point subject to the Commonwealth's agreeing that he will get one point. Because here it was a conditional agreement. The U.S. Attorney's Office specifically said that the cooperation we're agreeing to is there, but it's up to the court to assess it.  No, I understand what you're saying. The agreement did not override the... There are still two or three things the judge has to decide, but this is not one of them. The assertions made by the government in the motion, or in this case in the stipulation in the plea agreement, which served as the motion, are not something the judge is allowed to make his own finding on under the amended rule, and that's what the judge did. He violated the rule in that way. In fact, in, again, getting to the colloquy as opposed to the written agreement, we quote in the colloquy where the prosecutor himself refers to it as a stipulated three-level adjustment, that it's agreed, three-level adjustment. The sentence overall just didn't weigh the very substantial... If it is plain error, you've got Mount and Williamson, how can that survive plain error with those two cases going in different directions? You've got Mount saying it is discretionary, Williamson saying it's mandatory. Right, because this court has held in both, in the two cases we cited, bogus and one or the other, there's another, I'm forgetting which one it is right now, in the brief, that the plain language determines whether it is plain error, and the fact that other circuits disagree does not preclude a finding of plain error. I had one quick question, and that is that if we were to vacate the conviction on count three, would we still not, wouldn't we have to reach the substantive reasonableness of the 60-month sentence because it was imposed separately on that count? No, I would like to be able to say yes to that question, but I can't fairly say yes, because the sentence is imposed on the case as a whole, not on a count. It is formally imposed in the end on every count as it should be, but the package sentence is on the whole case. Thank you. Mr. Goldberger and Mr. Alvin, thank you very much for a very helpful argument, kind argument we're accustomed to from both of you, very fine attorneys, thank you both. Thank you.